SPOONER *v.* DETROIT SATURDAY NIGHT CO.

1. APPEAL AND ERROR—CERTIORARI—INDUSTRIAL ACCIDENT BOARD—
PERSONAL INJURIES—MASTER AND SERVANT.

> In reviewing a decision of the Industrial Accident Board,
> awarding compensation for the accidental death of an
> employee, a finding that decedent was an employee of
> the defendant will not be reviewed if there was evidence
> to support it.

2. MASTER AND SERVANT—WORKMEN'S COMPENSATION ACT—COURSE
OF EMPLOYMENT.

> Where decedent was employed to operate an engine and
> dynamo in the basement, and no duty called him to the
> upper floors, injuries incurred which caused his death
> while running an elevator from the second to the third
> floor did not arise out of and in the course of his em-
> ployment, under Act No. 10, Pub. Acts 1912 (2 How. Stat.
> [2d Ed.] § 3939 *et seq.*)[1]

Certiorari to the Industrial Accident Board.  Sub-
mitted June 16, 1914.  (Docket No. 10.)  Decided July
23, 1915.

Mary Spooner presented a claim against the Detroit
Saturday Night Company for the death of her husband
in defendant's employ.  From an order awarding com-
pensation respondent brings certiorari.  Reversed.

*McGregor & Bloomer* (*William L. Carpenter,* of
counsel), for appellant.

*Beaumont, Smith & Harris,* for appellee.

STONE, J.  This is a claim made by Mary Spooner,
widow of James Spooner, against the Detroit Saturday
Night Company, for compensation for the death of her

---

[1] For cases discussing the general rule of a master's liability to
a volunteer, see notes in 22 L. R. A. 664; 13 L. R. A. (N. S.)
561, 43 L. R. A. (N. S.) 187.

husband, under Act. No. 10, Pub. Acts 1912 (2 How. Stat. [2d Ed.] §3939 *et seq.*), known as the workmen's compensation act. The Detroit Saturday Night Company, having previously suffered a fire in its plant in the city of Detroit, on Monday, February 3, 1913, entered into a contract with the Winn & Hammond Company, through T. H. Collins, its receiver, as follows:

"DETROIT, MICH., Monday, February 3, 1913.

"Agreement between T. H. Collins, receiver for Winn & Hammond Company and the Detroit Saturday Night Company, City of Detroit, State of Michigan and County of Wayne on the 3d day of February, 1913.

"I agree for such a period as the said Winn & Hammond Company shall be under my control and until such time as twenty-four hours' notice shall be given to the Detroit Saturday Night Company to furnish the following equipment and power for same at the prices and under the conditions named in this instrument: Cylinder press at 75 cents per hour; Gordon press at 33 1-3 cents per hour; Power cutting machine at 50 cents per hour; stitching machine at 50 cents per hour; folding machine at 50 cents per hour; perforator at 50 cents per hour; the use of type, tones and material necessary for composition work at $3.00 per day.

"I also agree to furnish elevator service, telephone service and office service which shall consist of providing cards and keeping time of such employés as the said Detroit Saturday Night Company may assign to this plant for operating machinery rented to them at the rate of $10.00 per week.

"It is further understood and agreed between both parties that no type or other material shall be removed from the plant of the Winn & Hammond Company by the said Detroit Saturday Night Company.

"It is further agreed that should the Detroit Saturday Night Company wish to operate the machinery in this plant at any time other than the stated working hours of the Winn & Hammond Company, which are 7 a. m. to 11: 30 a. m. and 12: 15 p. m. to 5 p. m., that the charge for power service shall be $1.00 per hour in addition to the prices above quoted and that the Detroit Saturday Night Company agree to furnish a competent engineer to tend boiler and perform such

other duties as usually fall to a man in that capacity.

"It shall be optional with the Detroit Saturday Night Company how much of this machinery they shall operate and they agree to give ample notice when any additional machinery shall be wanted or discontinued.

"The said Detroit Saturday Night Company further agrees to abide by and perform any and all orders of the bankruptcy court concerning its occupancy and use of said property.

"[Signed]   H. H. NIMMO,
              "Vice Pres. Detroit Saturday Night Co.
"[Signed]   WINN & HAMMOND CO.,
              "Per T. H. COLLINS.
"Approved:   LEE E. JOSLYN, Referee."

The Detroit Saturday Night Company, in accordance with the terms of the foregoing contract, employed an engineer by the name of Leonard J. McCabe to operate the engine in said plant, on the night of February 6, 1913, that being the first night that said company operated said plant. This engineer was employed on Wednesday, February 5th. He went to the plant of the Winn & Hammond Company on Wednesday, February 5th, to look over the plant preparatory to taking charge of it on the night of February 6th. On this occasion he told James Spooner, then in charge of the plant, that he was going to take charge of the same on Thursday night, February 6th. On Thursday, February 6th, at about 5 o'clock, McCabe went to the plant for the purpose of taking charge that night. He saw Spooner, and the latter objected and desired himself to operate the engine. McCabe testified that Spooner told him that they were going to run about 9 o'clock, and that he (Spooner) would run himself that night, and it was not necessary for McCabe to stay. McCabe then went away and Spooner did actually operate the engine in said plant on the night of February 6, 1913. James Spooner, husband of claimant, was a stationary engineer in the employ of the Winn & Hammond Company, and had been in its employ as such stationary engineer

for a period of 20 years, or more, prior to said February 6th. His duties were to run the engine and dynamo in the plant. It was not a part of his duties to run the elevator, but he sometimes did so for his own convenience, as did other employees, in the absence of the regular elevator man, or when requested by the employer in furthering its work. On the night in question, or about two o'clock in the morning of February 7th, said James Spooner left his place of duty in the engine room in the basement of said plant and went to the upper floors of said building. In going to said upper floors he walked up the stairway. Upon the second floor he met Otto Loeffelbein, John C. Hussey, and a Mr. Wheeler, employees of the Detroit Saturday Night Company, and stopped with them and had a casual conversation. Shortly after James Spooner came upon said second floor said Hussey and the others started to go up the stairway from the second to the third floor of said building for the purpose of getting some stools to sit upon at their work; and thereupon said James Spooner offered to take them up on the elevator, saying: "What's the use of your walking; ride up." And said Spooner did then and there open the door of the elevator which stood there, and the said employees got upon the same and Spooner operated it in such a manner as to cause it to ascend. The elevator passed one floor in safety, and just as it was passing the next floor James Spooner received the injuries which caused his death. There was no light whatever upon the elevator, and the men upon it were unable to tell the cause of the accident from which Spooner suffered the injuries which caused his death. The claimant made demand upon the appellant for payment to her of compensation because of the death of said James Spooner, under the terms of said act. The appellant denied all liability to said Mary Spooner under said act. An arbitration was had under the act,

and the committee of arbitration awarded said Mary Spooner the sum of $2,520. The appellant filed a claim of review of the decision of said committee with the industrial accident board, and said decision of said committee was duly reviewed by said Industrial Accident Board, and on June 10, 1913, said board made a decision affirming the decision of said arbitration committee. The case is here for review upon certiorari.

The appellant insists that it did not make any contract, express or implied, of employment with said James Spooner, and that in his operation of said engine, on the night of February 6, 1913, he was acting as the employee of Winn & Hammond Company, and not as the employee of the Detroit Saturday Night. The Industrial Accident Board, in its fourth finding of fact, found as follows:

"Mr. Spooner was engaged in operating the engine in the plant for Winn & Hammond Co. until 5 o'clock in the afternoon of February 6th, and from that hour until he met his death, at about 2 o'clock in the morning of February 7th, he was in the employ of the Detroit Saturday Night Company, being engaged that night in operating the plant as engineer in getting out its paper, and that Spooner at the time of the accident was in fact an employee of the Detroit Saturday Night Company."

It is the claim of appellant that there was no evidence whatever to support this finding of fact. The said Industrial Accident Board found, as matter of law, that the injury received by said James Spooner, and which caused his death, arose out of and in the course of his employment by the Detroit Saturday Night Company, and that said employment was not a casual employment within the meaning of said act, so as to debar Mary Spooner from recovering compensation for the death of James Spooner.

By appropriate assignments of error the following propositions are presented by the appellant:

187 Mich.—9.

(1) That Spooner was not an employee of the Detroit Saturday Night Company as matter of law.

(2) That the injuries did not arise out of and in the course of his employment.

(3) That if Spooner was an employee of the Detroit Saturday Night Company, his employment was a casual employment.

1. On the first proposition urged by appellant, a careful reading of the evidence contained in this record leads us to the conclusion that we cannot say there was no evidence to support the finding that Spooner was an employee of the Detroit Saturday Night Company. Under the statute, as construed by this court, if there was evidence to support the finding, we will not review or weigh that evidence. *Rayner* v. *Furniture Co.*, 180 Mich. 168 (146 N. W. 665). We think there was some evidence in support of this finding.

2. Did the injuries arise out of and in the course of his employment? The appellant needed and had employed an engineer to operate the engine and dynamo upon the night in question. It was not concerned with and did not need the use of the elevator. As matter of fact, the agreement had provided that the Winn & Hammond Company was to furnish the elevator service, but no such service was needed by appellant that night. If we are right in saying, under the first proposition, that there was evidence that Spooner was in the employ of the appellant, that employment was solely to operate the engine and dynamo. The evidence is silent as to any other duty imposed upon him by the appellant. The engine room was located in the basement of the building; and, so far as this record shows, Spooner had no occasion to leave it, and had no duty to perform upon the upper floors of the building during the night of the injury. Under the evidence he had gone upon these upper floors purely and solely to visit with the men working there. The evidence is undisputed that he walked up the stairway. He owed no

duty to those men, or to anybody, to take them to the upper floors upon the elevator; neither was he requested to do so. It was doubtless a friendly act upon his part, which did not tend to further the business of appellant. At the time of the injury we think that he was engaged in an act outside of, and not in the course of, his employment, and the injuries he received and which caused his death did not arise out of and in the course of his employment. The elevator shaft was in pitch darkness, by the undisputed evidence, and in using it he not only risked his own life, but that of the men he took upon the elevator with him. Had he remained in the place where his duties called him and attended to those duties, he would not have been injured, so far as this record shows. The material question is not what he had done at times, for his own convenience or otherwise, while in the employ of Winn & Hammond Company, but the pertinent question is: What was he employed to do upon this night? Manifestly, to run and care for the engine and dynamo. This injury occurred while he was away from his work, and while he was a voluntary visitor to the employees of the appellant, and the act was for his own pleasure or satisfaction.

Counsel for appellee in support of their claim have called our attention to the case of *Miner* v. *Telephone Co.*, 83 Vt. 311 (75 Atl. 653, 26 L. R. A. [N. S.] 1195). In that case the plaintiff was an employee of the defendant telephone company. On the day of the accident defendant's foreman said to the linemen, of which the plaintiff was one, that they would go down and splice the cable at a certain point, and all went together to the place. On arriving there the foreman told the plaintiff and another lineman to go to a certain place and get a ladder. They were unable to get it, and the plaintiff so reported to the foreman on their return. The foreman was then on the cable seat, with his ma-

terials at hand, and was just commencing the work of splicing. After watching him awhile, the plaintiff said he guessed he would go up and help him, and received no reply. The plaintiff then ascended the pole and stood on an upper cross-arm and handed the sleeves to the foreman as he needed them, the foreman taking them from him and using them as he proceeded with the splicing. After working in this manner for about 20 minutes, the foreman placed the bag containing the sleeves on the other side of him, which put them beyond the plaintiff's reach; and, after looking on awhile, the plaintiff said he would go down, and proceeded to do so, receiving therein the injury complained of. These were the circumstances tending to show that the plaintiff was in the performance of his duty when he received the injury. In deciding the case for the plaintiff the court said:

"The voluntary offer of a willing servant to make himself useful in a matter not covered by any express command, when the proffered service is accepted by his superior, although not by an approval expressed in words, cannot be said, as matter of law, to put the servant outside the limits of his employment."

We think the case readily distinguishable from the instant case. In fact it might be said the plaintiff there was in the performance of and carrying on the very work for which he was employed, to wit: He was assisting his foreman, who undoubtedly represented the master. In the instant case Spooner was rendering no service which was either accepted by or known to his superior, but was engaged in a voluntary, friendly act entirely outside the scope of his employment upon the night in question.

Our attention is also called by appellee to the case of *McQuibban* v. *Menzies*, 37 Scottish Law R. 526. In that case a workman was engaged as a laborer in a steam joinery, his duty being to carry wood from the machine men to the joiners and to clean and sweep

up the floor of the machine room. A belt in connection with one of the machines became loose, and he went, without being asked so to do, to assist the machine man in replacing the belt upon the shaft. At the request of the machine man the workman ascended a ladder to try and replace the belt, and, his arm being caught in the belt, he was drawn up into the shaft and received fatal injuries. It was admitted that had a foreman been present he might have ordered the workman to do this act, but no other person had authority to order him to do so. Held, that the accident was one arising out of and in the course of his employment in the sense of the workmen's compensation act. The court said:

"The question of law which we have to decide is whether the deceased workman was injured by an accident arising out of and in the course of his employment, and although that would appear primarily to be a question of fact, there is no doubt that in cases of this kind questions of fact and law sometimes run into one another. The words 'arising out of and in the course of the employment' appear to me to be sufficient to include something which occurs while the workman is in his master's employment and on his master's work, although he is doing something in the interest of his master beyond the scope of what he was employed to do. The act does not say, 'when doing the work which he was employed to perform,' but it is a fair inference that if it had been intended to limit the right to compensation to such accidents, different language would have been used from that which occurs in the act. It must be assumed, therefore, that the legislature used language of wider scope to include cases where a workman intervenes to do something useful and helpful to his master, although outside the special duties which he is employed to perform."

After citing cases, the court concluded:

"The action of the workman in this case appears to me to have been a natural and helpful intervention in the conduct of his master's business, and accordingly I am of the opinion that the question should be answered in the affirmative."

Here, also, it clearly appeared that the servant was doing something in the interest of his master, or, in the language of the opinion, "something useful and helpful to his master." Such was not the fact in the instant case, as we have already stated.

Our attention is also called to language used by Ruegg in his work on Employers' Liability and Workmen's Compensation, at page 346, where that author says:

"The words 'arising out of the employment' may be satisfied if it is shown that the occupation in which the workman was engaged, though not strictly part of his duties, was being done in the mutual interest of the employer himself" (citing cases).

Here the same distinction is made which we have pointed out above. The case of *McQuibban* v. *Menzies, supra,* has been referred to as an "emergency case." Such cases seem to be an exception to the general rule where a workman, for the protection of his master's interests, acts in an emergency. Manifestly, there was no emergency in the instant case.

We are of opinion that the cases cited by appellant are applicable to the instant case, although the contrary is claimed by appellee. *Smith* v. *Railway Co.,* 1 Q. B. Div. (Law R. 1899) 141. In that case a ticket taker in the employ of the railway, after he had collected his tickets from a train, got upon the footboard of the train after it had started, to speak to a woman passenger, and was injured. It was held that the accident was not one arising out of and in the course of his employment. This case was disposed of upon the principle that where the workman is doing an act entirely for his own purposes, and in no way, either directly or indirectly, in the interest of his employer, then, however harmless such act may be, he loses the protection of the act whilst he is so engaged.

The court said, in *Reed* v. *Railway Co.,* 2 B. W. C. C. 109, 112:

"It is not that he thereby violated a rule, but that the accident did not arise out of or take place in the course of ·his employment at all.   It took place while for the moment he quitted his employment."

Of this case Mr. Ruegg says (p. 353) :

"It is a decision of the House of Lords, and may be said to establish finally the principle propounded in the first decision given on the words, viz., *Smith* v. *Lancashire & Yorkshire Railway Company, supra.*   This principle is that where the workman is doing an act entirely for his own purposes, and in no way, either directly or indirectly, in the interest of his employer, then, however harmless such an act may be, he loses the protection of the act whilst he is so engaged."

See, also, *Lowe* v. *Pearson,* 1 Q. B. Div. (Law R. 1899) 261.

Many other cases might be cited to the same effect.

We are of opinion that there was no evidence to support the conclusion that the injury arose out of and in the course of Spooner's employment, and for that reason appellant is under no liability to the claimant in this case.   This conclusion renders it unnecessary for us to consider the third proposition.   The decision of the Industrial Accident Board is therefore reversed.

KUHN, OSTRANDER, BIRD, MOORE and STEERE, JJ., concurred with STONE, J.   BROOKE, J., did not sit.

This case was originally assigned to the late Justice MCALVAY.